On behalf of Ms. Gates this time. May it please the court, my name is Greg Wallace and I represent Tammy Gates in the Social Security Disability Appeal. Ms. Gates is a 50-year-old woman who is unable to work due to severe and persistent pain in her neck and back. The issue before the court today is whether the ALJ properly discredited the opinion of Ms. Gates' treating primary care physician, Dr. Davidson. Dr. Davidson, after treating Gates since 2012, gave an opinion that she cannot do any work requiring sustained sitting or standing, that she requires frequent changing of positions and frequent breaks, and that she cannot engage in overhead work or reaching. None of those, other than the sustained standing limitation, none of those limitations found their way into the ALJ's RFC assessment. Ordinarily, under the rules of this circuit, treating doctor opinions are entitled to great deference. The ALJ in this case rejected Dr. Davidson's opinion. And he gave two reasons. He said first that it's inconsistent with his treatment notes. And second, it's inconsistent with her daily activities. Now, with respect to the treatment notes, there were several inconsistencies or supposed inconsistencies that the ALJ noted. He said, first of all, she had been undergoing conservative treatment by Dr. Davidson. Well, conservative treatment is one of those nice phrases that ALJs like to use that make it sound like that all you're doing is taking a few aspirin over the counter for your pain. Ms. Gates actually had undergone surgery for a herniated disc, and Dr. Davidson was treating her for persistent neck and back pain with steroid injections. He was also prescribing strong narcotic medications, all within the purview of the treatment modalities that a primary care physician typically uses. The ALJ also said that Dr. Davidson had not recommended treatment by a neurologist or back specialist. That's just not true. He did refer Ms. Gates to Dr. Campbell, the neurosurgeon who wound up doing an MRI and then operating on her a few months after she stopped working to repair a herniated disc in her cervical spine. Now, apparently, we don't know whether that surgery was unsuccessful. Dr. Campbell thought that her continued pain was muscular, so there was no real reason for Dr. Davidson to refer her back to a neurosurgeon for simply muscular-type pain. But nevertheless, she continued. The fact of the matter is that she continued having pain even after her surgery, which was treated by Dr. Davidson. The ALJ then third said that, well, there's no significant neurological or muscle abnormalities indicated in Dr. Davidson's treatment notes. But again, that's not true. The ALJ actually acknowledged that Dr. Davidson had found limited range of motion in Gates's back, neck, and arms. And finally, the ALJ emphasized that Dr. Davidson's treatment notes said that Gates was in, quote, no acute distress, unquote. I thought it said in no apparent distress, not acute distress. Because acute has a distinct medical meaning, whereas apparent distress really doesn't have a technical meaning, I don't think. I'm not sure that those terms aren't synonymous within medical terminology. I thought it was no acute distress, but I may be wrong about that. But typically, those kinds of things are – those kinds of descriptions are reserved to people, for example, who may be on the floor in pain from a heart attack or sweating profusely or something, as we explain in our brief. And this court has recognized in the Combs case that such descriptions really are not relevant when you're dealing with chronic pain-type situations. But the problem is acute distress, you're right, would be writhing on the floor in agony or experiencing distress of that very – and no apparent distress would indicate – maybe I'm wrong about this – would indicate that, look, she seems fine today. I mean, there's not a problem here, which would be potentially inconsistent with the treating physician's letter. Yes, it would be. And I don't – again, if he was referring to no apparent distress, maybe, again, what he thought it meant was no acute distress. Because he said, look, she's consistently complained of pain, and we have consistently observed things that are consistent with that throughout her course of treatment here over the several years that we've treated her. So one of the points that Dr. Davidson made in his letter was that her complaints and what he's seen in the clinic have been consistent together in that regard. Now, the daily activities that the ALJ said that Dr. Davidson's opinion was inconsistent with, again, the ALJ overstated those activities, as oftentimes ALJs do. If you look at her testimony, and specifically the testimony after the first hearing, she describes a very limited pattern of daily activities. She only can stand to cook for a little bit, and then she has very little house cleaning. She has to lay down and rest most of the days. Now, we can say, well, okay, of course that's what people who are going to be claiming disabled are going to say. But at the same time, you've got a 50-year-old woman here with a good work history, and a claimant with a good work history is entitled under the law of this circuit to considerable credibility. She's paid into the system all these years, and I think at least Dr. Davidson, with respect to his interaction with her, found her to be credible in that regard. Do we have to defer, though, in a different way to those particular findings? I mean, those are things we can't get off of bare record. When we look at the treatment notes versus the letter, we can evaluate that based on the documentary evidence. But the rest of it came in through testimony, what she could do, how she could do it, things like that. And that would seem to be a factual finding, and that might be subject to a more deferential standard of review, at least for factual findings. Is there anything to that? Well, I think the response I would have to that is that if you look at how the ALJ describes those activities, and then you look at how she describes those activities in both her testimony and in the forms that she submits, and those forms sometimes contain questions like, have you stopped beating your wife, kind of thing. But if you look at the two descriptions of her daily activities, the ALJ's description does not really match her own description. Now, I mean, we can say, well, maybe she's not telling the truth about that. But the ALJ can't just inaccurately describe what she's testifying and then say, well, that's her daily activities. So I think that's the starting point for that. You've got to take what she says at face value and then determine whether there's substantial evidence to support the ALJ's determination that that apparently was not credible, and then compare that with Dr. Davidson's notes. Why didn't Dr. Davidson ever say earlier that she had these restrictions? Was there any reason for that? Well, there was no reason for him to put any work-related restrictions into his treatment notes because she wasn't working at the time. But did he ever say she can't stand or sit or any of the kinds of things that he's saying now? No, not until he wrote these letters. But my point is, is that there was no occasion for him to, because she wasn't working, so why would he put meaningless restrictions on her in terms of his treatment notes? You know, don't, when you're working, don't go and lift this much. I understand he wouldn't do that, but would he say she can't do these things or this is, you know, in explaining what her condition is, he never said things that, I think that's part of what the ALJ is saying, he never said that she had the kind of disability that he's now saying in the letter. And what is that worth? Well, I think that's, I think if treating doctors, if family doctors typically put those things in their notes, which as I've reviewed hundreds of medical, thousands of medical records over the years, I just don't see that typically unless they're asked for work-related restrictions. Yeah, I know, but the ALJ's concern is, well, he's asked for it and so he'll sign anything, you know. So he's asked for it and he'll give it, but he never had those concerns before. You're saying, well, nobody ever asked him before, I guess, is your best answer. Yeah, and there's case law in this circuit that suggests that you can't take the absence of a doctor's opinion, you know, as substantial evidence to support the ALJ's decision if, you know, about work-related restrictions if he's never asked for it. So I think that would be the response that I have for that. Thank you. Thank you. Ms. McField, we'll hear from you. Good morning. May it please the Court, I am Adriel McField and I represent the Social Security Administration. The case before you today is not about terminology, what acute distress means, or even whether the ALJ properly summarized the plaintiff's daily activities. The case before you today is a textbook example of how a treating physician issued an opinion outside the scope of his own treatment records and the other medical evidence of record. The sole issue raised on appeal is whether the ALJ properly discounted Dr. Davidson's opinion. A treating physician opinion is not automatically entitled to controlling weight or deference. If an ALJ finds that a treating physician's opinion is inconsistent with the substantial evidence of record, as the ALJ did in this case, he may discount that physician's opinion. Here the ALJ gave valid reasons for discounting Dr. Davidson's opinion. The ALJ properly considered Dr. Davidson's own treatment records, the other medical evidence of record, plaintiff's daily activities, and plaintiff's report of her symptoms. Here Dr. Davidson opined that plaintiff could walk less than two hours and sit less than four hours on an eight-hour workday. He further opined that plaintiff would require frequent breaks and changing positions. Ultimately, Dr. Davidson opined that plaintiff could not perform any type of work due to extreme limitations in her ability to sit and to stand. However, Dr. Davidson's own treatment records contradict his opinion. Now I think it's very important for us to develop a timeline in the plaintiff's treatment. So we have her treatment prior to surgery. Dr. Davidson prescribed medication and one steroid injection for her back pain. He then referred her to a neurosurgeon who performed a cervical fusion. All that happened within three months of her alleged onset date. And that's also within three months of her initial complaint to her physician that she was experiencing neck and back pain. Now post-surgery, Dr. Davidson's records reveal that Plano's condition improved. Specifically, Dr. Davidson's examination findings only showed a reduced range of motion in her neck. And the only restriction he placed on the plaintiff was to avoid heavy lifting. He also prescribed conservative treatment consisting only of medication. Dr. Davidson did not prescribe any steroid injections post-surgery.  In fact, plaintiff reported to Dr. Davidson that her pain symptoms improved with medication. And she described her pain to Dr. Davidson as only moderate and intermittent in nature. These findings of Dr. Davidson contradict his opinion that plaintiff had extreme limitations in her ability to sit and stand. He has not noted any corresponding abnormalities in his clinical findings. So your point is that even if the condition was pretty bad pre-surgery, pre-cortisone shots, etc., that after the surgery and after those cortisone shots or steroid shots, the condition improved and is inconsistent with the later letter indicating that there would be significant limitations that would constitute a disability. That is correct. Post-surgery, it is clear that plaintiff's condition improved. She's reporting to Dr. Davidson that her pain symptoms have improved. His examination findings are only showing that she has a reduced range of motion. And he does impose restrictions on her, but that only restriction is to avoid heavy lifting, which is not in conflict with the ALJ found in this case. Next, the ALJ properly considered the other medical evidence in the record. So we also have Dr. Campbell, the neurosurgeon who performed the plaintiff's neck surgery. His treatment records show that the plaintiff's pain symptoms improved post-surgery. Dr. Campbell did examinations, and he did not find that she had any neurological defects. And when plaintiff complained of pain, Dr. Davidson performed diagnostic evaluations, which all came back normal. It showed that her cervical fusion was stable, and she had no other abnormalities. So two months post-surgery, we have Dr. Campbell's treatment records stating that plaintiff was reporting that her pain symptoms had improved. And moving forward, Dr. Campbell recommended that plaintiff undergo conservative treatment, which only consisted of over-the-counter medication, massage, and heat. So that's a part of the other medical evidence that the ALJ considered when discounting Dr. Davidson's opinion. He also considered consultative examiner Dr. Troxell's consultative examination. Now, Dr. Troxell found that on examination, plaintiff had a limited range of motion in her neck and also her lumbar spine. However, he found that she could perform all limb functions, including squatting and arising from a squatting position. He also found that she had no muscle weakness, no muscle spasms. She also had negative straight leg raises. She had no issues with her grip. What's the – and excuse my ignorance of this. I've been dealing with workers' compensation cases, which is a little different. But my question for you is, what's the significance of the consulting physician, the non-treating physician? Are you relying on that for evidence to, you know, post-conclusion that the treating physician's opinion is invalid because it's inconsistent? Or can you rely on the consulting physician's opinion to show that the treating physician's opinion is invalid? Which of the two are you relying on it for, or both? It's a little bit of both because the ALJ considers the entire record. And in that record, you have treating physician's opinions, and you also have treating physician's records. So a treating physician's opinion can't stand alone. It has to be supported by clinical findings. So the ALJ looks to what were those – what did that treating physician report in his treatment records? He also looks to what other medical evidence is in the record. That other medical evidence that's in the record is a consultative examination. And he determines whether that consultative examination findings are consistent with treating physician's records. So, for instance, we have Dr. Troxell, the consultative examiner. He finds that she has a reduced range of motion in her neck and lumbar spine. That's similar to what Dr. Davidson found. However, they have different conclusions at the end of their examinations. We have Dr. Troxell assessing plaintiff with only mild to moderate limitations in her ability to stand, walk, lift, and carry. And he did not assess any restrictions in her ability to sit. But with similar examination findings, we have Dr. Davidson, on the other hand, opining that this lady can't perform any type of work due to extreme limitations in her ability to sit and stand. So that's the type of evidence that the ALJ considered when discounting Dr. Davidson's opinion. Now, in regards to daily activities, that was just one factor that the ALJ considered. He summarized her daily activities. He did not say, just because she can perform these daily activities, she is not disabled or Dr. Davidson's opinion shouldn't stand. He, again, looks at, most importantly, Dr. Davidson's own clinical findings. Then he looks at Dr. Campbell, who's a specialist, his findings and their conservative treatment of plaintiff. And lastly, and most importantly, he looks at how does plaintiff describe her own symptoms. To Dr. Davidson, plaintiff says that her symptoms are improving and they're only moderate and intermittent. To Dr. Campbell, the plaintiff says that post-surgery, that her symptoms have improved. Now, at the administrative hearing, we have plaintiffs testifying that her pain symptoms not only improved, but that her medication was enormously effective and she had no side effects. So, in conclusion, it's not the role of this court to re-weigh the evidence, but to determine whether substantial evidence supports the ALJ's decision. The appellant has not provided any proof that the ALJ has erred in his decision. So, the commissioner respectfully requests this court to uphold the ALJ's decision. Thank you. Very well. Any more questions? No, I think I don't see any, so thank you for your argument. Thank you. Anything further, Mr. Wallace, or shall we submit the case? I think that's a good suggestion at this hour. Case is submitted. The court will file an opinion in due course. Thank you both for your arguments.